Filed 5/31/24  P. v. Quiroz CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H050637 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1497382) |
| v. | |
| JOSE HUGO QUIROZ, SR., | |
| Defendant and Appellant. | |

Defendant Jose Hugo Quiroz, Sr., kicked down the door of an apartment where he suspected rival gang members were present.  Co-participant Moses Cortinas fired multiple gunshots that killed one person and injured another.  Defendant was convicted by plea in 2018 of second degree murder and other offenses.  He petitioned in 2019 for resentencing under former Penal Code section 1170.95 (now Pen. Code, § 1172.6).[1]  The trial court denied the petition after an evidentiary hearing.  Defendant argues the trial court applied the incorrect standard of proof at the evidentiary hearing; that his trial counsel provided prejudicially ineffective assistance for not objecting on that basis; and that insufficient evidence supports the trial court's findings that defendant directly aided and abetted an implied malice murder.  Because we find the trial court's application of an

---

[1]  All statutory references are to the Penal Code.  In 2022 the Legislature renumbered section 1170.95 to section 1172.6 without substantive change to the text.  (Stats. 2022, ch. 58, §10, eff. June 30, 2022.)  Although the petition references section 1170.95, we refer to the current statute for clarity.

incorrect standard of proof at the evidentiary hearing was prejudicial, we will reverse the order denying the petition.

## I.    TRIAL COURT PROCEEDINGS

Defendant was charged by information with six counts comprising gang-related murder, attempted murder, residential burglary, assault, and active gang participation.[2] The same information charged Moses Cortinas with murder and other offenses.  As part of a negotiated disposition, defendant pleaded no contest to second degree murder (§ 187); attempted murder (§§ 664, 187); residential burglary (§§ 459, 460, subd. (a)); active gang participation (§ 186.22, subd. (a)); and assault with a deadly weapon (§ 245, subd. (a)(1)).  The prosecution elected not to pursue premeditation as to the attempted murder count; defendant admitted all other special allegations and the prior strike and prior serious felony allegations.  The trial court dismissed the burglary conviction in the

---

[2]  Specifically, the information charged defendant with:  murder (Pen. Code, § 187), including special allegations that the murder was committed for the benefit of a criminal street gang (Pen. Code, § 186.22, subd. (b)), and that a principal intentionally used a firearm to inflict great bodily injury or death on a person other than an accomplice (Pen. Code, § 12022.53, subds. (d), (e)(1)); attempted murder (Pen. Code, §§ 664, 187), including special allegations that the attempted murder was premeditated, was committed for the benefit of a criminal street gang (Pen. Code, § 186.22, subd. (b)), and that a principal intentionally used a firearm to inflict great bodily injury or death on a person other than an accomplice (Pen. Code, § 12022.53, subds. (d), (e)(1)); residential burglary (Pen. Code, §§ 459, 460, subd. (a)), including special allegations that the residence was occupied at the time (Pen. Code, § 667.5, subd. (c)(21)) and the burglary was committed for the benefit of a criminal street gang (Pen. Code, § 186.22, subd. (b)); active gang participation (Pen. Code, § 186.22, subd. (a)); attempted murder (Pen. Code, §§ 664, 187), including a special allegation that the attempted murder was committed for the benefit of a criminal street gang (Pen. Code, § 186.22, subd. (b)); and assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)), including special allegations that defendant personally inflicted great bodily injury (Pen. Code, §§ 12022.7, subd. (a), 1203, subd. (e)(3)) and committed the assault for the benefit of a criminal street gang (Pen. Code, § 186.22, subd. (b)).  The information also alleged one prior strike conviction (§ 667, subd. (b)–(i)), one prior serious felony conviction (§ 667, subd. (a)), and that defendant had served one prior prison term (§ 667.5, subd. (b)).

interest of justice and sentenced defendant to an indeterminate term of 30 years to life, consecutive to 22 years.

Defendant petitioned for resentencing in 2019. The prosecution stipulated that defendant's petition stated a prima facie case for relief (§ 1172.6, subds. (a), (c)). The parties stipulated that the trial transcripts from codefendant Moses Cortinas's jury trial would serve as the record for the evidentiary hearing (§ 1172.6, subd. (d)(3)).

## A. DEFENDANT'S TESTIMONY AT THE CORTINAS TRIAL

Defendant was 52 at the time of Cortinas's 2018 trial. He testified that he joined the El Hoyo Palmas gang in his teens. That gang was loosely affiliated with the Norteño gang. Their rivals were the "Southsiders." (Defendant appears to have used "Southsider" and "Sureño" interchangeably in his testimony.) Defendant was a first generation member of the gang. He transitioned to a mostly lawful life outside the gang in the 1990's, but began associating with the gang again after "getting back into drugs."

Defendant first met Cortinas in jail in 2009. They lost touch until 2014, when the two regularly spent time at Cortinas's residence near the Oakridge Mall. Defendant's son, Jose Quiroz, Jr. (hereafter, Junior), lived in South San Jose with defendant's ex-wife. Defendant learned that Southsiders who lived across the street from Junior were antagonizing Junior because he had not chosen a gang to join. This included vandalizing Junior's car, spraying graffiti, and breaking windows at defendant's ex-wife's apartment.

Defendant testified about stabbing a suspected Southsider in October 2014. Defendant had gone with Junior, Cortinas, and another man to a neighborhood where he suspected Southsiders would be present. Defendant wanted to confront the people who had been vandalizing Junior's car. He told Junior they were " 'going to go to this little neighborhood, and I'm going to find out who it is, find out what the hell they're doing, why they're doing this shit.' " He was looking "for some of these guys that would fit the description of Southsiders." Defendant saw someone fitting that description, confronted him, and asked him "if you bang, or 'Where you from?' Or something to that nature."

3

Defendant "stabbed him in the back" with a pocketknife because the person "gave [defendant] this little attitude," and defendant hoped that "if these little gang members, you show them that, you know, maybe there's a bigger gang here they'll back off."

Southsiders later returned to defendant's ex-wife's apartment, broke windows, and "tagged more on the walls." Defendant testified that he asked Cortinas for help in light of the escalation, but that neither Cortinas nor any other gang member responded. Defendant testified that he was considered by other gang members to be "an old man, washed up, has-been." (The gang expert at Cortinas's trial confirmed he had not personally seen any evidence suggesting that defendant was a shot-caller in the gang.)

Defendant testified about the charged November 2014 homicide. Junior told defendant he wanted to buy marijuana from someone in the neighborhood of the October stabbing. Because defendant was wary of Junior going to that neighborhood, he told Junior to pick him up at Cortinas's residence. Junior arrived with his girlfriend. After defendant told Cortinas he was going with Junior to " 'make sure nobody messes with him,' " Cortinas said he would also go with them. Defendant testified that he knew Cortinas had access to a handgun, but that he did not instruct Cortinas to bring it and did not know whether Cortinas had it when they got in Junior's car. The four started driving, with defendant and Cortinas in the back seat.

Junior drove to the neighborhood and located the marijuana dealer standing in the road. The dealer said, " 'Hey, you know those guys that broke your windshield, they're right there,' " pointing to an apartment building. Defendant got out of the car and walked toward two people in the carport of the apartment, followed by Cortinas. Defendant asked one of them, " 'are you a Southsider?' " The person denied being a Southsider and then said, " 'But if you're looking for Southsiders, they're upstairs in that apartment.' " Defendant went upstairs, followed again by Cortinas. Defendant testified that he went upstairs to "find out why the hell they keep doing this to this kid."

4

Defendant looked in the window of an apartment and saw a man in "gang clothes" he believed was a Sureño. Defendant kicked the door open and he and Cortinas entered the apartment. Defendant saw a "young man" trying to jump out a back window and yelled, " 'Hey.' " Cortinas fired the gun twice, which defendant testified was the first time he became aware that Cortinas was armed. Defendant ran out of the apartment. Defendant heard more gunshots a few seconds later when he was downstairs on the lawn. Defendant and Cortinas got into Junior's car and they drove away. Defendant testified that the shooting was not planned and that he was shocked Cortinas fired a gun.

By the time of Cortinas's trial, defendant had pleaded no contest to murder and other crimes related to the November shooting and was awaiting sentencing on those convictions. Defendant had also dropped out of the gang and was housed in protective custody.

## B. CORTINAS'S TRIAL TESTIMONY

Cortinas testified that at the time of the homicide defendant was a first generation member of El Hoyo Palmas, meaning that he "can make calls, can make orders, direct people to do things." Defendant gave Cortinas a gun at some point between the October stabbing and the November shooting, telling Cortinas to "hang onto it in the event that it was needed or he needed it."

Cortinas testified that defendant came to his residence on the day of the homicide. Defendant received a call from his son about wanting to "go pick up some weed in this area where he had problems -- previously." When defendant asked Cortinas to go with him and Junior, Cortinas questioned why they would go to that area, even offering to supply Junior with marijuana so that they would not have to go to that neighborhood. Defendant told Cortinas to "stop acting like a pussy" and suggested Cortinas might be reported to the gang if he did not go with them. Cortinas was afraid that he and his family would be at risk of harm if he did not comply. Defendant retrieved his gun from Cortinas.

5

Cortinas rode in the car with defendant, Junior, and Junior's girlfriend to the planned marijuana transaction. Defendant pulled the gun out of his waistband and put it on the car seat, then got out of the car and spoke in Spanish to the marijuana dealer. Cortinas picked up the gun because he did not want Junior's girlfriend to see it. Defendant told Cortinas to come with him, but defendant did not tell Cortinas to take the gun. Defendant "ran up on" a man in the carport and "yelled out, Are you a scrap? Do you bang?" The man in the carport denied gang involvement, but asked, " 'Hey, you looking for Squeezies?' Meaning Surenos." The man "pointed [in] the direction of an apartment and said, 'They're up there.' " Cortinas tried to stop defendant, telling him they should leave and come back later. Defendant responded, "No, they want to fuck with my son, let's go." Cortinas followed defendant upstairs.

Defendant looked through an apartment window. When Cortinas again suggested they leave, defendant responded, " '[f]uck that.' " Defendant kicked open the apartment door and Cortinas followed him inside. Cortinas noticed movement in a hallway and fired the gun twice in that direction. Cortinas testified that he was not trying to hit anyone with those shots. As he walked farther into the apartment he was hit with a pole, and he reflexively fired shots in that direction. Cortinas then ran out of the apartment.

## C. TRIAL COURT DECISION

The trial court made oral findings to explain its denial of defendant's resentencing petition. The court found that Junior told defendant about the harassment by Southsiders, which included by breaking windows and tagging walls. Junior told defendant the Southsiders lived in a particular neighborhood. Defendant drove to that area in October 2014, saw someone he believed to be a Southsider, and stabbed him with a pocketknife. Junior continued to be harassed by Southsiders. Junior called defendant in November 2014 about wanting to buy marijuana from someone in the neighborhood where the stabbing had occurred. Junior picked up defendant and Cortinas at Cortinas's residence and drove to that neighborhood. Cortinas "believed he had no choice but to go with"

6

defendant because defendant was a first-generation gang member. Defendant "knew that Moses Cortinas had a gun, but [defendant] never knew when and where he had it." The court found that defendant directed Cortinas to bring the gun that day; that Cortinas "gave the gun to [defendant] when they were in the car"; and that defendant "returned the gun to [Cortinas] before they got out of the car." The court also found defendant left the gun on the seat before getting out of the car.

The trial court further found that the marijuana dealer told defendant the people who had broken Junior's windshield were in an apartment. Defendant asked a man in the building's carport whether he was a Southsider. The man denied membership and pointed to an apartment. Defendant went upstairs, followed by Cortinas. Defendant kicked open the apartment door. Cortinas fired multiple gunshots into the apartment. Defendant fled and had done nothing to stop Cortinas from firing the gun.

After reciting its factual findings, the court indicated it was reading a legal standard from *People v. Vargas* (2022) 84 Cal.App.5th 943 (*Vargas*). The court stated, the "trial court concludes that [defendant] is ineligible for relief under Penal Code Section 1172.6, and that this finding is supported by substantial evidence." The court also paraphrased the following from *Vargas*: at "an evidentiary hearing under Section 1172.6(d)(3), the trial judge is charged with determining beyond a reasonable doubt that the petitioner is guilty of murder under a theory that remains valid after the amendments to the substantive definition of murder." (See *Vargas*, at p. 952.)

The trial court determined defendant was guilty of second degree murder under a direct aiding and abetting theory. The court indicated, "I have to give credit to [the deputy district attorney], because I am reading, basically, from his -- his memo." The court found defendant harbored both express and implied malice. The court determined defendant knew Cortinas "was going to use his gun to assault a Southsider inside the apartment." The court relied on Cortinas's testimony that defendant asked Cortinas to retrieve the gun on the date of the homicide; that defendant brought the gun with him in

7

the car; and that "Cortinas took possession of the gun and took it with him as the two advanced toward the apartment." The court noted defendant's "boldness and aggressiveness in locating and advancing into the apartment exemplify the confidence of a seasoned gang member who knew that his fellow gang member was equipped with a gun and was prepared to use it." The court concluded its oral findings by stating it would deny the resentencing petition "because a reasonable jury could find [defendant] guilty of second degree murder under a direct aiding and abetting theory of liability."

## II.  DISCUSSION

### A.  SUBSTANTIAL EVIDENCE SUPPORTS THE TRIAL COURT'S DECISION

Directly aiding and abetting an implied malice murder remains a viable theory of murder liability under current law. (*People v. Reyes* (2023) 14 Cal.5th 981.) To satisfy the required actus reus, an aider and abettor must, " 'by words or conduct, aid the commission of the life-endangering *act*, not the result of that act.' " (*Id.* at p. 991.) " 'The relevant act is the act that proximately causes death.' " (*Ibid.*) The required mens rea for implied malice is " 'knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.' " (*Ibid*.) The *Reyes* court confirmed that denial of a section 1172.6 petition is reviewed for substantial evidence unless there is a question about the trial court's understanding of the elements of the applicable offense. (*Reyes*, at p. 988.)

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) We do not reweigh evidence or second-guess credibility determinations. (*People v. Ramirez* (2022) 13 Cal.5th 997, 1118 (*Ramirez*).) We presume the existence of every

8

fact the trier of fact could reasonably deduce from the evidence to support the judgment. (*Ibid.*)

During his testimony at Cortinas's trial, defendant admitted extensive involvement in the events preceding the homicide. Defendant admitted he was a gang member who had a dispute with Southsiders who were vandalizing Junior's car and residence. Defendant admitted stabbing a Southsider in the back with a pocketknife the month before the homicide. Defendant testified that on the day of the homicide, he volunteered to accompany Junior to a drug purchase as protection. Defendant testified that he knew Cortinas had access to a handgun, but that he did not instruct Cortinas to bring it and did not know whether Cortinas had it when he got in Junior's car. Defendant testified that Cortinas followed him toward the apartment after the dealer said the people who broke Junior's windshield were there; that defendant led the way upstairs when a man in the carport told him Southsiders were upstairs; and that defendant kicked open the apartment door when he saw a suspected gang member inside. Based on the foregoing, defendant's briefing appropriately acknowledges he "likely entered the apartment with the intent to assault its inhabitants, especially where he kicked open the door once he arrived and entered the apartment without knocking."

Defendant focuses his appellate argument on whether the evidence supports either express or implied malice. The trial court found that defendant harbored express and implied malice because he "knew that [Cortinas] was equipped with a gun" and knew Cortinas "was going to use his gun to assault a Southsider inside the apartment." The court reasoned that defendant's "boldness and aggressiveness in locating and advancing into the apartment" was based on his knowledge that Cortinas was armed.

We acknowledge there was no direct testimony from defendant or Cortinas that defendant knew Cortinas was armed when they went upstairs. Defendant testified to his general knowledge that Cortinas had access to a handgun. Cortinas testified that the gun actually belonged to defendant and that defendant retrieved his gun from Cortinas before

9

they drove to the drug buy. Cortinas also testified that defendant had pressured him to come with them by threatening to report him to the gang, and that Cortinas was afraid he and his family would be at risk of harm if he did not comply. Cortinas confirmed that defendant put the gun on the seat before getting out of the car, and that Cortinas picked it up. (From defendant's testimony that he and Cortinas rode together in the back seat, it is reasonable to infer that defendant placed the gun on the back seat next to Cortinas.)

A trier of fact could reasonably infer from the foregoing that defendant knew Cortinas was armed when defendant kicked open the apartment door: defendant pressured Cortinas to come along on Junior's marijuana buy; defendant brought the gun to the car rather than leaving it at Cortinas's residence; defendant left the gun in the car next to Cortinas; followed by Cortinas, defendant led the way—himself unarmed—up the stairs to the apartment of suspected gang rivals and kicked open the door. Defendant's behavior supports a reasonable inference that he knew Cortinas was armed when they arrived at the apartment door.

Based on defendant's actions and his apparent knowledge that Cortinas was armed, the trial court's implied malice finding is supported by substantial evidence. Defendant demonstrated his willingness to use violence against rival gang members the month before the homicide when he stabbed one with a pocketknife. Defendant initiated the conflict on the day of the homicide, intent on confronting rival gang members who had been harassing his son. Kicking open the door of an apartment containing rival gang members with an armed accomplice adequately supports a finding that defendant acted with conscious disregard for human life.

Defendant argues the trial court relied exclusively on Cortinas' testimony, given the court's citations to that testimony in explaining its decision. We see nothing in the trial court's findings to suggest it ignored or refused to consider defendant's testimony. To the contrary, the trial court expressly referred to defendant's testimony multiple times in its findings. (In discussing motive, for example, the trial court noted defendant "said

10

that the Southsider gang activities and animosity toward his son increased to a level where Junior had to move away from the area.") Defendant also argues "reliance upon Cortinas' testimony is undermined by the rather obvious fact that the jury at Cortinas' trial did not believe Cortinas' testimony," and Cortinas's "credibility is further undermined by the admitted fact that he repeatedly lied to the police about his involvement." But in deciding the resentencing petition, the trial court here was sitting as a trier of fact and was entitled to make its own credibility determinations. Moreover, the jury's decision in Cortinas's trial does not impact whether *substantial evidence* supports the trial court's own findings here. Defendant's argument that the trial testimony from himself and Cortinas should have been given equal weight is foreclosed by that standard of review, which does not permit us to reweigh evidence or second-guess the trial court's credibility determinations. (*Ramirez*, *supra*, 13 Cal.5th at p. 1118.)

Defendant argues his flight once Cortinas started shooting suggests he did not harbor express or implied malice. He also contends he should not be faulted for not stopping Cortinas from advancing into the apartment because defendant did not have a gun and it "is unclear how appellant was supposed to stop Cortinas in this situation." We have summarized the evidence about the lead-up to the shooting that supports the trial court's findings as to implied malice. Defendant's factual arguments about what occurred after Cortinas started shooting does not compel a different result. Because the trial court's implied malice finding was sufficient, we need not reach whether substantial evidence also supports the express malice finding.

## B. ERROR IN APPLYING THE STANDARD OF PROOF WAS NOT HARMLESS

The parties disagree about whether the trial court properly applied the reasonable doubt standard of proof in reaching its conclusion. (§ 1172.6, subd. (d)(3).) Defendant preserved this argument by urging the trial court to apply the correct standard during the resentencing proceedings.

11

The trial court mentioned three different standards of proof during the hearing in which it denied the petition: substantial evidence; proof beyond a reasonable doubt; and what a "reasonable jury could find." Paraphrasing a heading from the *Vargas* opinion it referenced, the trial court stated that defendant "is ineligible for relief under Penal Code Section 1172.6, and that this finding is supported by substantial evidence." (See *Vargas*, *supra*, 84 Cal.App.5th at p. 952 ["The Trial Court's Conclusion that Appellant Is Ineligible for Relief Under Section 1172.6 Is Supported by Substantial Evidence"; bold omitted].) The trial court also paraphrased a quote from *Vargas*: at "an evidentiary hearing under Section 1172.6(d)(3), the trial judge is charged with determining beyond a reasonable doubt that the petitioner is guilty of murder under a theory that remains valid after the amendments to the substantive definition of murder." (See *Vargas*, at p. 952.) And the trial court ended its analysis by stating the resentencing petition would be denied "because a reasonable jury could find [defendant] guilty of second degree murder" under a direct aiding and abetting theory of liability. This final statement appears to be a quote from the end of the prosecution's written opposition to defendant's petition.

It is not clear from this record whether the trial court ultimately applied the correct standard. Although it noted the reasonable doubt standard from *Vargas*, it also stated that its ineligibility "finding is supported by substantial evidence," and that "reasonable jury could find" defendant guilty of second degree murder. The Attorney General points to a colloquy at an earlier hearing where the trial court asked about the applicable standard and the parties agreed it was proof beyond a reasonable doubt. But at the hearing where it announced its decision, the court nonetheless made two misstatements about the applicable standard (including one derived from the prosecution's pleadings). Because we cannot conclude from the trial court's various statements that it applied the correct standard, we must consider the issue of prejudice.

The parties disagree about the appropriate standard for assessing prejudice in this context. Defendant argues the error is reversible per se, while the Attorney General

contends the error is reviewed under *People v. Watson* (1956) 46 Cal.2d 818. The court in *People v. Vance* (2023) 94 Cal.App.5th 706 concluded the *Watson* prejudice standard applies when a trial court may have used an incorrect standard of proof at a section 1172.6 evidentiary hearing. (*Vance*, at p. 716; see also *People v. Garrison* (2021) 73 Cal.App.5th 735, 747 [rejecting per se reversal and concluding error there harmless under any other standard due to ineligibility as a matter of law].) A section 1172.6 proceeding is not a criminal prosecution; it is a statutory process that "reduces guilt and punishment on terms that the Legislature is entitled to prescribe." (*Vance*, at p. 716.) Because the Legislature and not the federal constitution has prescribed the applicable standard of proof, a trial court's application of an incorrect standard is an error of state law. (*Id.* at p. 717.) Based on these persuasive authorities, we will examine whether it is reasonably probable that a result more favorable to defendant would have been reached had the trial court applied the reasonable doubt standard.

We have described the evidence of defendant's extensive involvement in the events leading to the homicide. Much of that evidence came from admissions by defendant during his testimony at Cortinas's trial. Indeed, defendant acknowledges the evidence shows he "likely entered the apartment with the intent to assault its inhabitants." But there was no direct testimony that defendant knew Cortinas was armed with a gun when they went upstairs; that knowledge would be crucial to a finding that defendant harbored express or implied malice. Cortinas's trial testimony that defendant put the gun on the seat before getting out of the car could support an inference that defendant had no such knowledge. Although for purposes of substantial evidence review we determined that a trier of fact could reasonably infer defendant's knowledge from the circumstantial evidence presented, that does not resolve the different question of prejudice from an incorrect standard of proof. Given the opaque trial evidence about whether defendant knew his accomplice was armed when the two men entered the apartment, we see a reasonable likelihood of a result more favorable to defendant had the proper standard

13

been correctly applied after the evidentiary hearing. We leave it to the trial court on remand to determine, beyond a reasonable doubt, if the petitioner is guilty of murder under a theory that remains valid after the amendments to the substantive definition of murder. (*Vargas*, *supra*, 84 Cal.App.5th at p. 952.)

### III. DISPOSITION

The order denying the Penal Code section 1172.6 petition is reversed and the matter is remanded for a new evidentiary hearing.

_____
Grover, J.

**WE CONCUR:**


_____
Greenwood, P. J.



_____
Lie, J.


H050637
*People v. Quiroz*